**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAHMI AHMED MOHARAM<br>104 South Cabin Street Apt B<br>Ligonier, IN 46767;<br><br>*Plaintiff*,<br><br>      v.<br><br>FEDERAL BUREAU OF<br>INVESTIGATION;<br><br>TERRORIST SCREENING CENTER;<br><br>MERRICK GARLAND, Attorney General of<br>the United States, Department of Justice, in<br>his official capacity only;<br><br>CHRISTOPHER WRAY, Director of the<br>Federal Bureau of Investigation, in his official<br>capacity only;<br><br>CHARLES KABLE, Director of the Terrorist<br>Screening Center, in his official capacity<br>only;<br><br>DEPARTMENT OF HOMELAND<br>SECURITY;<br><br>ALEJANDRO MAYORKAS, Secretary of<br>the Department of Homeland Security, in his<br>official capacity only;<br><br>NATIONAL COUNTERTERRORISM<br>CENTER;<br><br>CHRISTINE ABIZAID, Director of the<br>National Counterterrorism Center, in her<br>official capacity only;<br><br>TRANSPORTATION SECURITY<br>ADMINISTRATION; and<br><br>DAVID P. PEKOSKE, Administrator of the<br>Transportation Security Administration,<br>Department of Homeland Security, in his<br>official capacity only;<br><br>                *Defendants*. | Civil Action No. 21cv2607 |

## COMPLAINT

1.      Through the opaque and secretive watchlisting process, the government has deprived plaintiff Fahmi Ahmed Moharam of his fundamental right to travel.  Mr. Moharam's placement on the No Fly List without affording him adequate notice and without a meaningful opportunity for redress violates his procedural and substantive due process rights arising under the Fifth Amendment of the United States Constitution, as well as the Administrative Procedure Act. Accordingly, through this lawsuit, Mr. Moharam seeks an order declaring that (1) defendants have violated and continue to violate his rights under the Fifth Amendment of the U.S. Constitution; and (2) defendants' actions against Mr. Moharam constitute an abuse of discretion and violate the Administrative Procedure Act.  Further, Mr. Moharam seeks an order that requires defendants to remedy their constitutional and statutory violations, including by (1) removing Mr. Moharam from the No Fly List, the Terrorist Screening Database (TSDB), and any other database or watchlist that prevents him from travelling to, from, or within the United States; and (2) providing a declaration that Mr. Moharam is no longer on the No Fly List or in the TSDB and will not be placed back on such list or in such database based on currently available information.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises, in part, under the Fifth Amendment of the United States Constitution.

3.      There has been no final determination by DHS or the TSA Administrator regarding Mr. Moharam's placement on the No Fly List.  Mr. Moharam's response to the last correspondence received from DHS regarding his placement on the No Fly List is due October 19, 2021. Accordingly, 49 U.S.C. § 46110 is not applicable to this action.

4.      Venue is appropriate in this Court under 28 U.S.C. § 1391(e) because a substantial

part of the events giving rise to the plaintiff's claims occurred in this district.

## PARTIES

### A. Plaintiff

5.      Plaintiff Fahmi Ahmed Moharam was born and raised in Yemen before immigrating to the United States and becoming a United States citizen.  He currently resides and works in Indiana.

### B. Defendants

6.      Defendant Federal Bureau of Investigation is a component of the Department of Justice.  Defendant FBI administers the Terrorist Screening Center (TSC), which was created to consolidate the federal government's terrorism-related screening capabilities.

7.      Defendant Terrorist Screening Center is responsible for maintaining the TSDB. The No Fly List is a subset of the TSDB.

8.      Defendant Merrick Garland is the Attorney General of the United States and heads the U.S. Department of Justice (DOJ).  Defendant Garland is sued in his official capacity only.

9.      Defendant Christopher Wray is the Director of the FBI.  Defendant Wray is sued in his official capacity only.

10.     Defendant Charles Kable has been the Director of the TSC since April 2013. Defendant Kable is sued in his official capacity only.

11.     Defendant Department of Homeland Security ("DHS") is a department of the U.S. government.  It develops and coordinates the national security strategy of the United States.  DHS operates the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP).

12.     Defendant Alejandro Mayorkas is the Secretary of DHS.  Defendant Mayorkas is sued in his official capacity only.

13.     Defendant National Counterterrorism Center (NCTC) is a government organization under the authority of the Office of the Director of National Intelligence.  The NCTC is intimately involved with the process of nominating individuals to the TSDB and the No Fly List, as well with as the DHS TRIP redress process.

14.     Defendant Christine Abizaid is the Director of the NCTC.  Defendant Abizaid is sued in her official capacity only.

15.     Defendant Transportation Security Administration (TSA) is an agency of the U.S. government under the authority of DHS.

16.     Defendant David A. Pekoske is the Administrator of the TSA.  Defendant Pekoske is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### A.     THE TERRORIST SCREENING DATABASE AND THE NO FLY LIST

#### 1.     The TSDB and No Fly List Nomination Process

17.     The TSDB is the federal government's terrorist watchlist.  The TSC has maintained the TSDB since 2003.

18.     Individuals are added to the TSDB through a process of "nomination."  The FBI and the NCTC are the two entities primarily responsible for the process used to nominate individuals for inclusion in TSDB, which is then used to populate the No Fly List.

19.     The process of nominating and approving individuals for placement on the TSDB is a black box that relies on ill-defined, amorphous criteria, provides no notice to individuals prior to their inclusion (and the concomitant deprivation of their rights), and is utterly lacking in safeguards.

20.     According to the "Overview of the U.S. Government's Watchlisting Process and Procedures" (the "Watchlisting Overview") released by the U.S. government in January 2018, in

4

order for a person to be nominated to the TSDB, the "nomination must include enough identifying information to allow screeners to determine whether the individual they are screening is a match to a record in the TSDB" and must also include "enough information to establish a reasonable suspicion that the individual is a known or suspected terrorist."  TSC makes the final decision as to whether a nomination satisfies the requirements for TSDB inclusion as a "known or suspected terrorist."

21.    Once an individual is included in the TSDB, that person may be placed on the No Fly List, barring him from boarding an aircraft to or from the United States, as well as any aircraft that flies over U.S. airspace.  As with the TSDB, the TSC acts as the gatekeeper for who is included on the No Fly List.

22.    According to the Watchlisting Overview, in order for a nomination to the No Fly List to be accepted by the TSC, there must be reasonable suspicion that the individual poses a threat of:  (1) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft; (2) committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; (3) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations, U.S. ships, U.S aircraft, or other auxiliary craft owned or leased by the U.S. Government.

23.    The Overview also contains a catch-all provision, permitting nomination to the No Fly List when an agency determines an individual poses a threat of engaging in or conducting a violent act of terrorism and is operationally capable of doing so.

24.    The TSC shares records it maintains in the TSDB, including the No Fly List, with

other government agencies, including defendant TSA, for use by airlines to pre-screen travelers.

25.    Individuals who are included on the No Fly List are not provided any notice prior to their inclusion on the No Fly List nor are they provided any notice of the resulting deprivation of their constitutional right to travel.

### 2.    The TSBD and the No Fly List Are Replete with Errors.

26.    Guilt-by-association is a common basis for inclusion in the TSDB.  The TSC has historically added friends, family members, or other associates of an individual on the TSDB to the TSDB.  These associates can be added without any accompanying derogatory information at all, other than the fact they are associated with another individual in the TSDB.

27.    Further, the FBI and NCTC erroneously add people to the TSDB due to seemingly similar names, typos, and other mistakes on a routine basis.

28.    Additions to the TSDB have skyrocketed over the last ten years.  More than triple the number of individuals were added into the TSDB in 2016 than were added into the TSDB in 2009.  Approximately 99% of all nominations are accepted into the TSDB each year, which now, according to the Congressional Research Service, includes over one million individuals.  Upon information and belief, according to leaked government documents, nearly half of the people on the TSDB have no connection at all to any known terrorist organization.

29.    In 2009, the DOJ Office of Inspector General completed an audit report on the FBI's terrorist watchlist program (the "2009 DOJ OIG Report"), which concluded that the "FBI did not update or remove watch list records as required."  The 2009 DOJ OIG Report found that the FBI failed to:  (1) remove records in a timely manner in 72 percent of cases where it was necessary; (2) modify watchlist records in 67 percent of cases where it was necessary; and (3) remove associations to the FBI's terrorism case classifications in 35 percent of cases where it was necessary.

6

30.     Given that the TSDB is used to populate the No Fly List, it is no surprise that various government reports and audits similarly have concluded that the No Fly List is rife with errors and inaccuracies, and lacks quality controls.

31.     For example, in 2006 the U.S. Government Accountability Office found that tens of thousands of entries were mistakenly added to the No Fly List due to misidentification.

32.     Similarly, the Department of Justice's Office of Inspector General noted in a 2007 report that fully 43% of No Fly List records that were reviewed contained errors, calling the TSC's internal quality assurance process "weak."  These failures are due to a persistent lack of quality controls in the process of accepting nominations to the No Fly List.

33.     Moreover, a 2009 Department of Homeland Security Office of Inspector General Report titled "Effectiveness of the Department of Homeland Security Traveler Redress Inquiry Program" (the "2009 DHS TRIP Report") noted that a major airline encountered 9,000 erroneous terrorist watchlist matches per day in April 2008.  The 2009 DHS TRIP Report also noted that while DHS TRIP, discussed below at paragraphs 34-45, offers solutions to some traveler issues, "it does not address other issues effectively, including the most common—watch list misidentification in aviation security settings."

**3.      DHS TRIP Is Ineffective at Redressing Erroneous Placement on the No Fly List.**

34.     The only process for individuals seeking to resolve travel-related issues due to placement on the No Fly List is DHS TRIP.

35.     Under the current procedures, if a United States citizen or lawful permanent resident who has been denied boarding initiates an inquiry pursuant to DHS TRIP, DHS will send a notification letter that affirmatively states whether the individual is in fact on the No Fly List.

36.     If the individual requests more details, DHS TRIP will forward the file to the TSC

Redress Office, which then notifies the NCTC and the relevant nominating agency (either the FBI or NCTC) that a request for additional information has been submitted.

37.     The TSC Redress Office then requests an unclassified summary of the basis for an individual's placement on the No Fly List from the nominating agency.  Upon receiving this unclassified summary, the TSC forwards the case back to DHS TRIP.

38.     DHS TRIP is then required to provide more detail to the individual, specifying the criteria used to evaluate the individual's placement on the No Fly List and, to the extent feasible, providing an unclassified summary of information that states the basis for an individual's inclusion in the No Fly List.  There is no time limit for DHS TRIP to provide this information and many individuals— including Mr. Moharam—have waited years to receive the summary.

39.     This second, more detailed explanation will provide an opportunity for a traveler to submit written responses, including exhibits or other materials, to challenge his or her placement on the No Fly List ("DHS TRIP Appeal").

40.     Upon DHS TRIP's receipt of an individual's DHS TRIP Appeal, DHS TRIP sends the traveler's written response and any included information to the TSC.  The TSC then reviews the response and other available information.

41.     If the TSC determines that the individual seeking review should not remain on the No Fly List, the TSC has the authority to remove them from the No Fly List.  If the TSC determines that they should remain on the list, the TSC submits a recommendation to the TSA Administrator that includes a summary of reasons for that determination.

42.     The TSA Administrator then must issue a final determination and furnish the individual with a final written letter providing the basis for the decision.  TSA must also notify the individual of the right to seek further judicial review under 49 U.S.C. § 46110.

43.     DHS TRIP is largely ineffective.  More often than not, DHS TRIP refuses to release specific facts regarding placement on the No Fly List and fails to timely process numerous complaints related to the No Fly List.  Availing oneself of the DHS TRIP process usually includes waiting months or years just to get confirmation of placement on the No Fly List.  DHS TRIP also does not appear to be effective at assisting individuals who may share a name or date of birth with a watchlisted identity.

44.     Further, there is no hearing afforded as part of the DHS TRIP process and no opportunity to cross-examine relevant witnesses.

45.     In addition, the DHS TRIP process provides no mechanism for accessing any documents that may be relied upon as a substantial basis for the TSC's continued inclusion of an individual on the No Fly List or an individual's information within the TSDB.

### B.     MR. MOHARAM'S RIGHTS HAVE BEEN VIOLATED.

46.     In practice, and as applied to Mr. Moharam, the DHS TRIP process for Mr. Moharam to challenge his placement on the No Fly List is deficient and does not comport with the standards demanded by the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.  Defendants have not provided a legal mechanism that affords Mr. Moharam adequate notice of the reasons for his placement on the TSDB and No Fly List, or a meaningful opportunity to contest his continued inclusion on the TSDB and No Fly List.

### 1.     Mr. Moharam Has Been Deprived of His Right to Travel.

47.     Mr. Moharam was born in Yemen, but has lived in the United States for most of his life and is a United States citizen.

48.     For most of his adult life, Mr. Moharam regularly flew in U.S. airspace.  Similarly, like tens of thousands of Yemeni-Americans, Mr. Moharam regularly traveled to Yemen

throughout his adult life, including to pursue religious studies and to visit his mother, wife, children, and other relatives who reside there.

49.    Mr. Moharam is not, and has never been, a threat to national security.  Mr. Moharam does not pose any threat of committing, engaging in, or conducting any act of terrorism.

50.    Upon information and belief, Mr. Moharam was placed on the No Fly list no later than October 2017, when he was denied the right to fly home to the United States from a religious pilgrimage in Saudi Arabia.

51.    Mr. Moharam was subsequently able to return to the United States in late 2017 pursuant to a one-time waiver, described more fully below, available to U.S. citizens and lawful permanent residents who are on the No Fly List.

52.    Before filing the instant complaint and in the hope that perhaps, with the passage of time, officials had finally rectified his unjustified placement on the No Fly List, Mr. Moharam attempted to board a flight on August 3, 2021 from Oakland, CA to Las Vegas, NV.  Mr. Moharam was not permitted to board this flight.  Two unidentified law enforcement agents approached him at the airport and questioned him for approximately ten minutes about his inability to fly.

53.    Due to his placement on the No Fly List, since late 2017 Mr. Moharam has been separated from his family members who currently reside in Yemen, including his mother, his wife, and all of his children, except for his oldest son.

54.    Mr. Moharam's mother in Yemen is in poor health and Mr. Moharam has not been able to visit her or care for her in the ways he could prior to his placement on the No Fly List.

55.    Because of Mr. Moharam's unjust and unlawful placement on the No Fly List, he has suffered emotional and psychological harm because of his inability to visit his children and

mother, and financial harm resulting from increased costs to travel within the United States to see his father.

### 2.  The Redress Process Available to Mr. Moharam Is Constitutionally Insufficient.

56.     On October 25, 2017, Mr. Moharam, as directed by airline personnel, contacted officials at the U.S. Consulate General in Jeddah, Saudi Arabia to determine how he could return to the United States.  He was told by consular officials that they would look into the matter and contact him with additional information.

57.     According to emails provided to Mr. Moharam by the Department of State pursuant to the Freedom of Information Act, on the afternoon of October 27, 2017, State Department personnel in Jeddah had obtained from the TSC guidance regarding how to instruct Mr. Moharam to obtain a one-time waiver to return the U.S. by air.

58.     On October 29, 2017, a State Department employee ("State Employee 1"), wrote to another State Department employee ("State Employee 2") who, on information and belief, worked at the U.S. Consulate in Jeddah, Saudi Arabia.  State Employee 1 asked whether Mr. Moharam had been provided with the appropriate guidance regarding his ability to obtain a one-time waiver.  In response, State Employee 2 told DOS Employee 1 that "My understanding is that we are not there yet in terms of the letter," and that after Mr. Moharam was interviewed, "we will then regroup and discuss next steps."

59.     State Employee 1 replied, asking State Employee 2 for clarification, noting that it was "fine" to delay delivery of the one-time waiver guidance to Mr. Moharam if there was "some operational reason," but emphasized that as an American citizen Mr. Moharam has a right to re-enter the United States and that "we have a general obligation to in a timely fashion explain to him how to do that."

60.     State Department employees intentionally delayed giving Mr. Moharam those instructions, however, and failed to timely inform him of his right as a U.S. citizen to return to the United States, despite being in possession of such guidance since October 27, 2019.  Instead, State Department employees requested that Mr. Moharam come to the Consulate two days later, on October 29, 2017.  Mr. Moharam believed that his visit to the Consulate concerned his ability to fly back to the United Sates.  Instead, it was engineered to provide an opportunity for Mr. Moharam to be interrogated by law enforcement officials from the Regional Security Office in Riyadh and at least one member of the FBI legal attaché's office in Riyadh.

61.     On October 29, 2017, after being interrogated by officials from the Regional Security Office and at least one member of the FBI legal attaché's office in Riyadh, Mr. Moharam submitted an inquiry to DHS TRIP in an effort to challenge his placement on the No Fly List and return to the United States from Yemen.

62.     It was not until November 21, 2017 that Mr. Moharam was granted a one-time waiver to return to the United States via a commercial flight operated by a U.S.-based commercial carrier.  As part of this one-time waiver process, Mr. Moharam was required to provide a proposed itinerary, which was reviewed by the TSC.  Mr. Moharam returned to the United States on December 15, 2017.

63.     Nearly four months after the initial denial of boarding, by letter dated February 14, 2018, DHS TRIP confirmed to Mr. Moharam that he had been placed on the No Fly List.  A true and correct copy of this correspondence is attached as Exhibit A.

64.     On March 13, 2018, Mr. Moharam then timely filed a request seeking the reasons for his placement on the No Fly List.  A true and correct copy of this correspondence is attached as Exhibit B.

65.    Mr. Moharam did not receive a response to this request for nearly two years. During this period, there were no other administrative redress options available for Mr. Moharam to contest his placement on the No Fly List.

66.    In February 2020, DHS finally provided Mr. Moharam a two-sentence-long unclassified "summary," which DHS claimed was the only information it could provide regarding the reasons for his placement on the No Fly List.  Specifically, DHS stated that Mr. Moharam was "on the U.S. Government's No Fly list because the Government has concerns about [his] activities during frequent and extended travel to Yemen between 2011 and 2017.  The information [he] shared during [his] interview at the U.S. Consulate in Jeddah in November 2017 [sic] did not assuage the Government's concerns."  A true and correct copy of this correspondence is attached as Exhibit C.

67.    This unclassified "summary" does not satisfy the obligation of DHS to provide information sufficient to allow Mr. Moharam to respond adequately to the allegations concerning him or challenge his placement on the No Fly List.

68.    Mr. Moharam's only form of administrative redress is to submit a DHS TRIP Appeal.  But the DHS TRIP Appeal process has proved woefully inadequate.  TRIP offers no meaningful review of his No Fly List designation and insulates the TSC from any meaningful administrative oversight with respect to individual nominations.

69.    That is especially true here given that DHS has provided a purported "summary" of reasons for Mr. Moharam's placement on the No Fly List that does not contain any details that would allow him to mount an effective DHS TRIP Appeal.  Critically, DHS did not provide Mr. Moharam any information that would allow him to actually respond to any "derogatory information."  One example of this is the vague statement that the government has "concerns"

13

about his "activities."  It is impossible for Mr. Moharam to meaningfully challenge his placement on the No Fly List or craft an administrative appeal that effectively responds to the government's alleged but undescribed "concerns" about his travel in Yemen.

70.     Mr. Moharam has also been deprived of documents that are necessary to challenge his placement on the No Fly List, which the government has withheld on the vague grounds that national security concerns preclude their disclosure.   In particular, DHS TRIP refused Mr. Moharam's May 20, 2020 request for documents related to the October 29, 2017, FBI/Regional Security Office interview in Jeddah, Saudi Arabia.   The perfunctory, unclassified summary referenced the interview specifically, asserting that "the information you shared during your interview at the U.S Consulate in Jeddah in November [sic] 2017 did not assuage the Government's concerns."   Mr. Moharam was forced to pursue separate FOIA litigation just to receive partial, heavily redacted reports related to the October 29, 2017, interrogation in Jeddah, Saudi Arabia.

71.     Additionally, Mr. Moharam is represented by counsel with an appropriate security clearance who were nonetheless denied access to any classified information concerning the basis for Mr. Moharam's placement on the No Fly List.   Because Mr. Moharam has retained counsel with appropriate security clearances, DHS can and should produce any responsive classified material that is not otherwise exempt from disclosure to his security-cleared counsel.

72.     Further, there is no impartial arbiter in the DHS TRIP process that can test the government's claim that national security reasons prevent the government from sharing additional information.   Such an independent party is necessary for the DHS TRIP process to conform to procedural due process requirements.   Additionally, there is no impartial arbiter to adjudicate Mr. Moharam's DHS TRIP appeal.

73.     Nor does Mr. Moharam have any opportunity for a hearing through the DHS TRIP

process even though hearings are required where lesser or similar liberty deprivations are at issue, such as the loss of a community board seat coupled with public accusations of criminal behavior, or revocation of a passport.

74.    Without additional procedural safeguards, including a full statement of reasons, access to relevant documents for security-cleared counsel, and a live hearing, Mr. Moharam has been, and continues to be, deprived of a meaningful opportunity to contest his continued inclusion on the No Fly List.

**FIRST CLAIM FOR RELIEF**
**Violations of Mr. Moharam's Fifth Amendment Procedural Due Process Rights**
**(as to all defendants)**

75.    Mr. Moharam hereby alleges and incorporates by reference the allegations of paragraphs 1-74 above.

76.    Mr. Moharam has a protected liberty interest in travelling domestically and internationally within or over U.S. airspace.

77.    Defendants' placement and retention of Mr. Moharam on the No Fly List violated his constitutionally protected liberty interests by depriving him of his right to travel and making it impossible for him to travel by plane to see his mother, wife, and children in Yemen.

78.    Defendants have included Mr. Moharam on the No Fly List without notice and without providing him with a constitutionally adequate mechanism to challenge his inclusion on the No Fly List and the resulting deprivation of his liberty interests, as described above.

79.    Defendants have deprived  Mr. Moharam of a meaningful opportunity to challenge his placement on the No Fly List, and DHS TRIP does not and has not provided Mr. Moharam with an adequate procedure to contest his placement therein, by failing to provide Mr. Moharam (1) a full statement of reasons or bases on which defendants relied to place and maintain him on

the No Fly List; (2) the information supporting those bases; (3) the opportunity to challenge his placement in a live hearing before a neutral decision-maker; and (4) access for security-cleared counsel to any classified information allegedly supporting his placement.

80.     Defendants therefore have deprived Mr. Moharam of his constitutionally protected liberty interests without adequate procedural due process.

**SECOND CLAIM FOR RELIEF**
**Violation of Mr. Moharam's Fifth Amendment Rights Caused by Unconstitutionally Vague Criteria for Inclusion on the No Fly List, as Applied to Mr. Moharam (as to all defendants)**

81.     Mr. Moharam hereby alleges and incorporates by reference the allegations of paragraphs 1- 74 above.

82.     The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

83.     The criteria for inclusion on the No Fly List, as established and executed by defendants, are unconstitutionally vague under the Fifth Amendment as applied to Mr. Moharam because defendants failed to provide him with fair notice of what prohibited conduct they believe justifies his placement on the No Fly List.

84.     The only justification given to Mr. Moharam for his placement on the No Fly List is unspecified government concerns regarding his travels to Yemen from 2011 to2017. It is thus impossible to ascertain what conduct Mr. Moharam has engaged in that the government considers relevant to the No Fly List criteria.

### THIRD CLAIM FOR RELIEF
**Violation of Mr. Moharam's Fifth Amendment Substantive Due Process Rights
(as to all defendants)**

85.     Mr. Moharam hereby alleges and incorporates by reference the allegations of paragraphs 1- 74 above.

86.     Mr. Moharam's fundamental rights include the right not to be arbitrarily deprived of his freedom to travel to, from, and within the United States, as well as over U.S. air space.

87.     Defendants' placement of Mr. Moharam on the No Fly List directly and substantially infringes on Mr. Moharam's fundamental liberty right to travel.

88.     Defendants' placement and retention of Mr. Moharam on the No Fly List serves no governmental interest whatsoever.  Mr. Moharam is not a threat to national security interests or aviation.

89.     Defendants violated Mr. Moharam's constitutional rights and have deprived him of a fundamental right without legitimate governmental interest.

### FOURTH CLAIM FOR RELIEF
**Violations of the Administrative Procedure Act, §§ 702, 706
(as to all defendants)**

90.     Mr. Moharam hereby alleges and incorporates by reference the allegations of paragraphs 1- 74 above.

91.     Defendants' placement of Mr. Moharam on the No Fly List, and failure to provide him with a constitutionally adequate mechanism to challenge his placement constitute agency actions under the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. §§ 701, 706.

92.     The APA prohibits federal agency action that is arbitrary, capricious, unconstitutional, an abuse of discretion or contrary to law.  5 U.S.C. § 706.

93.     Defendants have failed to provide Mr. Moharam with an adequate mechanism that

affords him adequate notice and the reasons for his placement on the No Fly List and have failed to provide him a meaningful opportunity to be heard and contest his placement on the No Fly List. To date, DHS TRIP has provided only two sentences justifying his placement on the list, which lack the context and specificity necessary to permit a meaningful response.  Defendants' actions are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, unconstitutional, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

94.     For similar reasons, the DHS TRIP process fails to provide Mr. Moharam with a meaningful opportunity to be heard.

95.     Defendants have no rational basis to suspect Mr. Moharam of presenting a threat to commercial aviation or national security.  Defendants' actions as described above in including Mr. Moharam on the TSDB and No Fly List are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Moharam respectfully requests that the Court:

a.  Declare that defendants violated, and continue to violate, Mr. Moharam's rights under the Fifth Amendment to the U.S. Constitution;

b.  Declare that defendants' actions against Mr. Moharam violated, and continue to violate, the Administrative Procedure Act;

c.  Issue an order that requires defendants to:

   i.  Remedy the constitutional and statutory violations identified above, including by removing Mr. Moharam from the Terrorist Screening Database, the No Fly

List, and any other database that prevents him flying to, from, and within the United States;

ii.   Provide a declaration that Mr. Moharam is no longer in the Terrorist Screening Database and/or on the No Fly List and will not be placed back on the list and/or in the database based on currently available information;

iii.  In the alternative, provide Mr. Moharam with a legal mechanism that affords him adequate notice of the reasons for his placement in the Terrorist Screening Database and on the No Fly List and a meaningful opportunity to contest his continued inclusion on the Terrorist Screening Database and the No Fly List;

d.  Award Mr. Moharam reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

e.  Grant Mr. Moharam such other relief as the Court deems appropriate.


Dated: October 6, 2021                    Respectfully submitted,


By:  s/Robert S. Litt

Robert S. Litt (D.C. Bar No. 312470)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, D.C. 20006
Telephone: (202) 887-1588
Email:  rlitt@mofo.com

Adam J. Hunt (pursuant to LCvR 83.2(g))
Janie C. Buckley (pursuant to LCvR 83.2(g))
MORRISON & FOERSTER LLP
250 W. 55th St.
New York, NY 10019
Telephone: (212) 468-8000
Email:  adamhunt@mofo.com
            jbuckley@mofo.com

-and-

**CLEAR PROJECT**
**MAIN STREET LEGAL SERVICES, INC.**

*/s/ Ramzi Kassem*
Ramzi Kassem (pursuant to LCvR 83.2(g))
Naz Ahmad (pursuant to LCvR 83.2(g))
CUNY School of Law
2 Court Square
Long Island City, NY 11101
T: (718) 340-4558
F: (718) 340-4478
E:      ramzi.kassem@law.cuny.edu
         naz.ahmad@law.cuny.edu

*Counsel for Plaintiff Fahmi Ahmed Moharam*